09 CV 832

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ADAM KREYSAR and TINA KREYSAR, Individually and On Behalf of All Others Similarly Situated, | ) ) ) **CIVIL ACTION NO.** |
| | ) |
| Plaintiffs, | ) **CLASS ACTION COMPLAINT** ) |
| v. | ) ) |
| | ) **JURY TRIAL DEMANDED** |
| RICHARD SYRON, ANTHONY PISZEL, PATRICIA COOK, GOLDMAN, SACHS & CO., J.P. MORGAN CHASE & CO., BANC OF AMERICA SECURITIES LLC, CITIGROUP GLOBAL MARKETS INC., CREDIT SUISSE SECURITIES (USA) LLC, DEUTSCHE BANK SECURITIES INC., MORGAN STANLEY & CO., INCORPORATED, AND UBS SECURITIES LLC, | ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

FILED

JAN 29 2009

U.S.D.C. s.D. N.Y.
CASHIERS

Plaintiffs Adam Kreysar and Tina Kreysar ("Plaintiffs"), on behalf of themselves and all

others similarly situated, allege the following based upon the investigation by Plaintiffs' counsel,

which included, among other things, a review of the Defendants' public documents, conference

calls and announcements made by Defendants, United States Securities and Exchange

Commission ("SEC") filings, wire and press releases published by and regarding Federal Home

Loan Mortgage Company a/k/a Freddie Mac ("Freddie Mac" or the "Company"), securities

analysts' reports and advisories about the Company, documents and testimony provided to the

House Oversight and Government Reform Committee, and information readily available on the

1

Internet. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a federal class action arising out of Defendants' material false and misleading statements made in connection with an offering ("Offering") by Freddie Mac of $6 billion of 8.375% Fixed to Floating Rate Non-Cumulative Perpetual Preferred Stock Series Z ("Series Z") that commenced on or about November 29, 2007. The Series Z preferred shares traded on the New York Stock Exchange at all relevant times under the symbol "FREPRZ."

2.      The Offering involved the sale of approximately 240 million shares of fixed-to-floating rate, non-cumulative, perpetual preferred stock. It was part of Freddie Mac's effort to raise new capital through public offerings of new securities during late 2007 and early 2008. The new capital was purportedly needed to help shore up the Company's balance sheet so that capital requirements could continue to be satisfied, enhance shareholder value and provide stability to the secondary mortgage market. Freddie Mac's senior officers, who are Defendants herein, repeatedly assured the marketplace that this round of capital-raising would put the company on a sound financial footing.

3.      The Underwriter Defendants were the managing underwriters for the Offering. As such, they participated in the review and drafting of the Offering Circular, which was the official sales document for the Offering, solicited sales of the Offering, and identified themselves in the Offering Circular as the underwriters for the Offering. The Underwriters purchased 240 million shares of the Offering, delivered the Offering Circular to prospective investors, and resold those shares to investors in the Offering. The Underwriter Defendants received

2

approximately $90 million in underwriter fees.

4.      The statements Defendants made in connection with the Offering were materially false and misleading because (a) they grossly overstated Freddie Mac's capitalization, and (b) they failed to disclose Freddie Mac's true exposure to mortgage-related losses, poor underwriting standards and risk management procedures, and the resulting negative impact to its capital adequacy.

5.      Indeed, internal Freddie Mac documents released during recent Congressional hearings reveal that Freddie Mac executives disregarded warnings as far back as 2004 about its loan portfolio.  Freddie Mac knew that its portfolio was increasingly risky, but failed to modify its public disclosures accordingly.

6.      In June 2008, the Federal Government announced that it was skeptical of Freddie Mac's (and Fannie Mae's) financial position and was actively considering various plans for possibly bailing out Freddie Mac if necessary.  Legislation was proposed, and passed, that authorized the Federal Reserve to infuse unlimited amounts of capital into Freddie Mac. Simultaneously, the Government commenced a comprehensive review of Freddie Mac's financial condition, to determine exactly what might be needed to shore up its financial position.

7.      The Treasury Department and the Federal Reserve reviewed Freddie Mac's books and discovered, among other things, that Freddie Mac was seriously undercapitalized.  On September 6, the Secretary of the Treasury, Henry Paulson, announced that the Federal Government would be assuming control of Freddie Mac and putting it into conservatorship, in order to forestall a potentially catastrophic disruption of the mortgage and financial markets.

8.    This event destroyed almost all that was left of the value of the Series Z

Preferred Stock. Initially offered at $25 per share, the stock presently trades at less than $1.00.

As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market

value of the Company's preferred shares, Plaintiffs and other Class Members have suffered

significant losses and damages.

## JURISDICTION AND VENUE

9.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of

the Securities Exchange Act (15 U.S.C. §§ 78j(b)  and 78(t).

10.    This Court has jurisdiction over the subject matter of this action pursuant to

Section 27 of the Securities Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

11.    Venue is proper in this Judicial District pursuant to Section 27 of the Securities

Exchange Act. Many of the acts and transactions alleged herein, including the preparation and

dissemination of materially false and misleading information, occurred in substantial part in this

Judicial District.

12.    In connection with the acts, conduct and other wrongs alleged in this Complaint,

Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mails, interstate telephone communications and

the facilities of the New York Stock Exchange.

## PARTIES

13.    Plaintiffs, as set forth in the accompanying certification, incorporated by reference

herein, purchased Freddie Mac's preferred stock following the Offering at artificially inflated

prices during the Class Period and have been damaged thereby.

4

14.    Non-party Freddie Mac is a government-sponsored enterprise with its principal offices located at 8200 Jones Branch Drive, McLean, Virginia 22102-3110. Freddie Mac provides funds to mortgage lenders through the purchase of mortgage assets, and issues and guarantees mortgage-related securities.

15.    Defendant Richard Syron ("Syron") was, at all relevant times, the Company's Chief Executive Officer ("CEO") and Chairman of the Board.

16.    Defendant Anthony "Buddy" Piszel ("Piszel") was, at all relevant times, the Company's Chief Financial Officer ("CFO") and Executive Vice President.

17.    Defendant Patricia Cook ("Cook") was, at all relevant times, the Company's Chief Business Officer and an Executive Vice President of Investments.

18.    Defendants Syron, Piszel and Cook are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Freddie Mac's reports, press releases, documents, and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each defendant was provided with copies of the Company's reports, press releases and documents alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were

5

each "group-published" information, the result of the collective actions of the Individual
Defendants.

19.     Defendant Goldman, Sachs & Co. ("Goldman") is headquartered in New York,
New York.  Goldman was the Joint Book-Running Manager and underwriter of the Offering,
soliciting and selling shares in the Offering, and received a portion of the underwriters' fees in
connection therewith.

20.     Defendant JP Morgan Chase & Co. ("JP Morgan") is a corporation that is
headquartered in New York, New York.  On May 30, 2008, JP Morgan acquired Bear, Stearns &
Co., Inc. ("Bear Stearns") and assumed all of its debts and obligations, not expressly assumed by
the United States, including its liability in this action.  Bear Stearns was the Senior Co-Lead
Manager and underwriter of the Offering, soliciting and selling shares in the Offering, and
received a portion of the underwriters' fees in connection therewith.

21.     Defendant Banc of America Securities LLC ("BAS") is a subsidiary of Bank of
America Corporation, and is headquartered in New York, New York.  BAS was a Co-Manager
and underwriter of the Offering, soliciting and selling shares in the Offering, and received a
portion of the underwriters' fees in connection therewith.

22.     Defendant Citigroup Global Markets Inc. ("Citigroup"), a division of Citi, is
headquartered in New York, New York.  Citigroup was a Co-Manager and underwriter of the
Offering, soliciting and selling shares in the Offering, and received a portion of the underwriters'
fees in connection therewith.

23.     Defendant Credit Suisse Securities (USA) LLC is a subsidiary of Credit Suisse
Group, and is headquartered in New York, New York. Credit Suisse Securities (USA) LLC was a

Co-Manager and underwriter of the Offering, soliciting and selling shares in the Offering, and received a portion of the underwriters' fees in connection therewith.

24.     Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") is a subsidiary of Deutsche Bank AG, with offices in New York, New York. Deutsche Bank was a Co-Manager and underwriter of the Offering, soliciting and selling shares in the Offering, and received a portion of the underwriters' fees in connection therewith.

25.     Defendant Morgan Stanley & Co. Incorporated ("Morgan Stanley") is a subsidiary of Morgan Stanley and is headquartered in New York, New York. Morgan Stanley was a Co-Manager and underwriter of the Offering, soliciting and selling shares in the Offering, and received a portion of the underwriters' fees in connection therewith.

26.     Defendant UBS Securities LLC ("UBS") is a subsidiary of UBS AG, and has offices in New York, New York. UBS was a Co-Manager and underwriter of the Offering, soliciting and selling shares in the Offering, and received a portion of the underwriters' fees in connection therewith.

27.     Defendants Goldman, Sachs & Co., JP Morgan Chase & Co., Banc of America Securities LLC, Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc., Morgan Stanley & Co., Incorporated, UBS Securities LLC, are collectively referred to hereinafter as the "Underwriter Defendants."

7

## SUBSTANTIVE ALLEGATIONS

### Background

28.     Freddie Mac is one of the nation's largest sources of financing for home

mortgages. The U.S. Congress chartered Freddie Mac in 1970 for the purpose of providing

liquidity in the secondary mortgage market in order to increase the availability and affordability

of homeownership for low, moderate and middle-income Americans. Although created by

Congress, the U.S. government did not guarantee, directly or indirectly, Freddie Mac's securities

or other obligations. Freddie Mac is a private, shareholder-owned company and its common

stock is publicly traded on the New York Stock Exchange ("NYSE") under the symbol "FRE."

29.     Congress' central idea behind creating Freddie Mac and Fannie Mae was to

encourage home ownership by buying mortgages from banks - freeing up banks' limited capital

and therefore allowing the banks to make more loans. The purchase also relieved the banks of

both the credit risk (the risk the holder of the loan might default) and the interest rate risk (the

risk that the interest rates might rise during the life of the loan). Freddie Mac and Fannie Mae

have several advantages over other banks, including that they are exempt from state and local

taxes and have less stringent capital requirements than banks. Also, their cost of capital is kept

low by the market's belief that the U.S. government would never let them default, even though

the U.S. government does not formally guarantee their debt.

30.     Freddie Mac operates exclusively in the secondary mortgage market and does not

lend money directly to consumers. Freddie Mac makes its money in two major ways. The first

and more conservative way is its credit guaranty business. In this part of its business, Freddie

Mac gets a fee for guaranteeing the payments on the mortgages it buys, which it then re-sells to

investors, usually in the form of mortgage-backed securities ("MBS"), i.e., beneficial interests in

pools of mortgage loans or in other mortgage-related securities issued by Freddie Mac. Freddie

Mac receives fees for its guaranty of timely payment of principal and interest payments due to

certificate holders on the MBS it issues. Freddie Mac typically shares the credit risk on the

underlying mortgages with third parties such as the lenders that originated the mortgages and

private mortgage insurance companies.

31.     The second and more aggressive way that Freddie Mac makes money is its

portfolio investment business. In this part of its business, Freddie Mac holds the mortgage loan

and mortgage-related securities and other investments that it purchases from commercial banks,

savings and loan associations, mortgage companies, securities dealers and other investors and it

also purchases short-term, non-mortgage assets for liquidity and investment purposes. Freddie

Mac funds these portfolio purchases by issuing short and long term debt and by selling debt

securities to domestic and international capital market investors. Freddie Mac profits to the

extent that the yield on the mortgage assets and other investments in its portfolio exceeds its low

cost of capital (the cost of the debt securities it issued to fund those portfolio investments).

32.     Due to the important role Freddie Mac plays in providing liquidity and stability to

the secondary mortgage market in the United States, its operations are highly regulated. The

Company is subject to strict minimum capital requirements which are imposed by its regulator,

the Office of Federal Housing Enterprise Oversight (the "OFHEO").

**2007: Freddie Mac Reassures Investors Amidst Downturn in Real Estate Market**

33.     A severe decline in the U.S. housing market began in 2006 and continued

unabated through 2007. As a result, mortgage defaults rose substantially and Freddie Mac began

9

suffering losses. Accordingly, Freddie Mac's capital position had deteriorated significantly by

the end of 2007 and it needed to raise additional capital, through equity offerings, to comply with

regulatory requirements.

34.     On March 15, 2007, Defendant Syron testified before the House Committee

on Financial Services. Syron stated that Freddie Mac had adequate capital to protect itself and its

shareholders in the event of a financial catastrophe:

> As an initial matter, Freddie Mac has always been more than adequately
> capitalized under both the risk-based and minimum capital ratios- for us, the more
> stringent of the two- established under current law. As the graph below clearly
> illustrates, before OFHEO's imposition of the current 30 percent add-on for
> operational risk, we held a surplus over regulatory minimums, and, as of
> September 30, 2006, held a $3 billion cushion over the OFHEO mandatory target
> surplus.
>
> This is real, permanent, at-risk capital that provides the first line of defense in the
> unlikely event of a financial catastrophe at Freddie Mac.

35.     On April 17, 2007, Defendant Syron testified again before the Committee on

Financial Services, stating: "Freddie Mac participates in the subprime market by investing in

highly rated AAA bonds backed by subprime mortgages. . . . Our participation in the subprime

market has been as a responsible investor -- and we continue to take that role very seriously."

36.     On Mary 14, 2007, Syron appeared at the UBS 2007 Global Financial Services

Conference and reassured the attendees:

> Freddie's disciplined approach to credit underwriting and our high asset quality
> has put us in the position to make this commitment.
>
> As we've discussed in the past, at the end of 2006, Freddie had basically no
> subprime exposure in our guarantee business, and about $124 billion of AAA
> rated subprime exposure in our retained portfolio.

* * *

10

So there you have it. A market that will be growing by roughly 8 percent. And doing business squarely within it, a company with low levels of interest rate and credit risk, growing customer volumes, improving operations, and increased return of capital to our shareholders.

Even if things were to get considerably worse for housing- and as an economist, I believe the markets respond appropriately and that the excess will be worked off within the next year or so- Freddie is strongly positioned to ride out the storm. As housing emerges from its current slowdown, <u>we will remain a very sound long-term investment in the growing U.S. mortgage market</u>.

(Emphasis added.)

37.    On May 17, 2007, Defendant Cook gave a speech at the Lehman Brothers

Financial Services Conference. Cook repeated to the statements made by Syron on May 14,

2007.

38.    On July 26, 2007,  Defendant Syron gave a speech at the National

Urban League and stated, "In February, Freddie Mac became the first secondary market

participant to announce we won't buy subprime mortgages that pose an unacceptable risk of

excessive payment shock and possible foreclosure."

39.    On September 27, 2007, Senior Vice President Michael May appeared at the

Freddie Mac Multifamily Leadership Conference. May described Freddie's successes in the face

of a changing market:

The subprime meltdown [sic] from residential spread into multifamily. The CDO market dried up. CMBS spreads widened out considerably. Subordination levels went up. Investors backed out of deals. Conduits left the market en masse. And lenders and borrowers turned to Freddie for help.

And suddenly, our business picked up. A lot. In fact, in August we had our biggest month ever for rate locks: 210 loans worth a whopping $3.8 billion! That's an annual run rate of $46 billion on a book that normally runs one-third of that amount. And now, we have a new problem: we simply have more business

11

than we can easily process.

40.     On November 10, 2007, Defendant Cook addressed the Lehman Brothers

Financial Services Conference and stated:

> "Despite the recent market turbulence, today's trends benefit Freddie Mac in the
> long run. Our growth is good. Our Credit position is relatively strong with
> limited exposure on the riskiest mortgage products. We've made meaningful
> progress on remediation. We're demonstrating our mission value in a very visible
> way. Bottom line, at a time when many of our competitors are weakening,
> Freddie Mac's position is growing stronger."

Cook then discussed Freddie Mac's supposed low risk exposure to Alt-A products:

> The table behind me shows that on an absolute basis, Freddie Mac has very low
> exposures to Alt-A and risk layered mortgage products. When taken together
> these represent about 8 percent of our total single-family guarantee portfolio.
>
> So again, whether you view our overall portfolio, or look to our Alt-A book,
> layered products, total single-family delinquencies, or charge-offs, we feel our
> credit position is near the very best in the industry.

(Emphasis added.)

41.     On November 13, 2007, Defendant Syron gave a speech at the Conference on

the Liquidity Crunch at UCLA. Syron again touted the Company's conservative standards for

subprime lending:

> Here's some of what Freddie Mac has done to be part of the solution.
>
> First, we raised standards – early. In February, we were the first investor to
> announce tightened lending standards to limit payment shock for subprime
> borrowers, and help ensure these borrowers can afford and keep their homes. The
> only subprime securities we buy today that are backed by short-term
> adjustable-rate mortgages have been underwritten to a fully-indexed,
> fully-amortizing level. This is consistent with a number of our other efforts to
> combat predatory lending and help families not only to buy homes, but to keep
> them.
>
> Next, in April, we committed to purchase an incremental $20 billion in more

12

consumer-friendly mortgages that will provide better choices for subprime borrowers. We began delivering on that commitment this summer. I'll return to this in a few minutes.

We are also working hard to ensure there is no disruption in the supply of mortgage funds. For example, in August we offered needed support to the Alt-A market by providing a 90-day forward purchase commitment to certain lenders, which allows borrowers to "lock in" their rate.

(Emphasis added.)

     42.     On November 20, 2007, the Company announced a third quarter loss of $2 billion

due to higher-than-expected delinquencies in loans held in its mortgage portfolio. As part of its

November 20, 2007 announcement, the Company issued a Supplement to its March 23, 2007

Information Statement ("November 20, 2007 Supplement"). In the November 20, 2007

Supplement, the Company downplayed the significance of its losses, noting, among other things:

"During the past year we have taken important steps to address the impact of the declining housing and credit markets to our business," Piszel added. "We have begun raising prices, tightened our credit standards and enhanced our risk management practices. We also continue to improve our internal controls as we move closer to completing our remediation efforts and returning to timely financial reporting. These actions position us well to take advantage of opportunities when the current market dislocation ends."

\* \* \*

**Capital Management**

Estimated regulatory core capital was $34.6 billion at September 30, 2007, which represented an estimated $8.5 billion in excess of the regulatory minimum capital requirement, and an estimated $0.6 billion in excess of the 30 percent mandatory target capital surplus directed by OFHEO. Retained portfolio sales in September and October largely reflected activities to manage to the 30 percent mandatory target capital surplus.

(Emphasis added.)

     43.     On November 20, 2007, the Company also issued its "Financial Report for the

13

Three and Nine Months Ended September 30, 2007 in the form of a Supplement to its March 23,

2007 Information Statement ("November 20, 2008 Financial Report"). The November 20, 2007

Financial Report stated in relevant part:

### Capital Management

Our primary objective in managing capital is preserving our safety and soundness.
We also seek to have sufficient capital to support our business and mission. As
appropriate, we make investment decisions based on our capital levels. In
September 2007, we reduced the balance of our retained portfolio in order to
manage to the 30% mandatory target capital surplus. At September 30, 2007, our
estimated regulatory core capital was $34.6 billion, which is an estimated $8.5
billion in excess of our regulatory minimum capital requirement and $0.6 billion
in excess of the 30% mandatory target capital surplus.

\* \* \*

### Mortgage Credit Risk

Mortgage credit risk is primarily influenced by the credit profile of the borrower
on the mortgage, the features of the mortgage itself, the type of property securing
the mortgage and the general economic environment. To manage our mortgage
credit risk, we focus on three key areas: underwriting requirements and quality
control standards; portfolio diversification; and portfolio management activities,
including loss mitigation and the use of credit enhancements.

All mortgages that we purchase for our retained portfolio or that we guarantee
have an inherent risk of default. We seek to manage the underlying risk by
adequately pricing for the risk we assume using our underwriting and quality
control processes. Our underwriting process evaluates mortgage loans using
several critical risk characteristics, such as credit score, loan-to-value ratio and
occupancy type.

\* \* \*

Certain loan characteristics are often associated with a higher degree of credit risk.
For example, mortgages with high LTV ratios and borrowers who have lower
credit scores typically experience higher rates of delinquency, default and credit
losses. We take a disciplined approach to the acquisition of mortgage loans and
generally participated in these products when we believe we are appropriately
compensated for the credit risk.

14

(Emphasis added.)

44.    That same day, on November 20, 2007, the Company held its Q3 2007 Earnings

Conference Call ("Q3 2007 Conference Call").  On the call, the Company's management team

continued their campaign to portray the Company as above the market turmoil and well

positioned.  For example, Defendant Syron stated, "I want to reiterate to everyone on the call that

the GSEs were set up for times like these.  Over time, Freddie has prospered by committing

capital in these environments, managing credit and interest rate risk to acceptable levels and

earning attractive long-term results."  Following Syron's comments, Defendant Cook explained

to investors that the Company's assets were of the "highest credit" quality:

> Let's turn to a discussion of the risk profile and profit outlook for the retained
> portfolio.  The credit profile of our retained portfolio remains of the highest credit
> quality with 57% in agency mortgages and 33% in non-agency securities, of
> which 97% is AAA rated and does not include any CDOs.  These asset-backs are
> critical to our ability to meet our affordable lending objectives and allowed us to
> invest in non-prime markets with substantial credit enhancements.  Despite the
> continued deterioration of the housing market and increases in non-prime
> delinquencies, we remain comfortable with our risk position on these assets.  For
> the subprime securities, while we have experienced some downgrades, we have
> high levels of subordination that support these investments, as shown on slide ten.
> Even at a 50% cumulative default rate and 50% severity assumption, no losses are
> projected on these securities.
>
> * * *
>
> From a business perspective, even in this difficult business environment, we
> continue to benefit from a relatively strong credit position.  We will have higher
> core spread income in the retained portfolio.  We have taken steps to continue our
> mission and improve our business and we are experiencing significant growth and
> pricing power in our G-fee business.  All of these business drivers will contribute
> to improved returns over the long-term.

(Emphasis added.)

45.    During the Q3 2007 Conference Call, Defendant Piszel elaborated on the

Company's exposure to credit losses in its guarantee fee business:

> Our guarantee fee business experienced a $7 billion pretax reduction in value, due to significant declines in the market value of the net guarantee asset and guarantee obligation and widening credit spreads and the lower market prices on our portfolio of delinquent loans. This resulted in a GO that Patti referred to of approximately $17 billion, which overstates what we expected to become realized credit losses. A more reasonable outcome is $10 billion to $12 billion. I think there was a glitch in Patti's script when she gave $10 to $20 billion. She meant $10 to $12 billion.

> * * *

> Given the opportunities to deploy capital, and uncertainty of our GAAP results and credit conditions, as well as uncertainties on the relief of the 30%, we are planning on taking several actions to bolster our capital. First, we have engaged Lehman Brothers and Goldman Sachs to help us consider capital raising alternatives in the very near term. Second, we are seriously considering a 50% reduction in our common dividend. These actions, coupled with other management steps, should provide sufficient capital flexibility for us to manage the Company for our shareholders and meet our charter through the balance of this credit downturn. When things return to normal, we are committed to returning the excess capital to our shareholders. With that, let me turn things back to Dick.

(Emphasis added.)

## **The False Offering Documents**

46.    On November 29, 2007, just one week after reassuring the market about its low risk exposure and adequate capitalization, Freddie Mac launched a $6 billion initial public offering of 240 million shares of Series Z fixed-to-floating rate, non-cumulative, perpetual preferred stock, with an annual dividend of 8.375%, at an offering price of $25 per share. The offering circular for the Series Z preferred offering (the "Offering Circular") was drafted and reviewed by both the Individual Defendants and the Underwriter Defendants, and listed the names of the Underwriter Defendants on the cover.

47.    The Offering Circular summarized, and incorporated by reference, the Company's

16

most recent Annual Report and 10-K and 10Q filings, including its statements concerning the

company's capitalization. According to the Offering Circular:

> The capital raised from the sale of the Preferred Stock will be used to bolster our
> capital base in light of actual and anticipated losses necessitated by GAAP
> accounting requirements and help us meet the 30% surplus going forward. We
> expect to deploy such proceeds for the purchase of residential mortgages or
> mortgage-related securities (subject to regulatory constraints), for the financing of
> growth in our mortgage guarantee business and for other corporate purposes
> consistent with evolving business and market conditions.

Offering Circular at 16.

48.    However, the data in the Offering Circular reflected a patently inadequate

write-down of the Company's investments in sub-prime and so-called "Alt-A" mortgages, "liar's

loans" that require little or no documentation or verification of the borrowers' employment,

income or assets. During the peak period in the housing market, 2005 and the first half of 2006,

more and more borrowers were resorting to Alt-A and subprime loans, and the Individual

Defendants decided that, to maintain Freddie Mac's market share, it would have to start

participating heavily in that segment of the mortgage market for the first time. The default rate

on those loans was far greater than for any other type of mortgage loan. Freddie Mac was equally

deficient in failing to establish a sufficient reserve for its guarantees of mortgage-backed

securities based on subprime and Alt-A loans.

49.    As a result, the asset values reported in the Offering Circular, and in the

Information Statement, 10K and the 10Qs, which were incorporated by reference into the

Offering Circular, drastically overvalued Freddie Mac's portfolio of Alt-A mortgages and related

securities.

17

## Defendants' False and Misleading Statements Following Offering

50.     On December 11, 2007, the Company participated in the Goldman Sachs

Financial Services Conference ("Goldman Sachs Conference"). At the Goldman Sachs

Conference, Defendant Syron discussed the strengths in the Company's risk management and

capital management:

> The case historically has been that (inaudible) very, very low levels of interest rate
> and credit risk in our retained portfolio. Specifically, 99% of the securities in the
> portfolio business, the one on your right, have security ratings of AAA or better in
> a duration gap over time. We focus a lot on duration that's average zero months.
> We're a matchbook provider. We don't bet on the direction of interest rates. We
> make money over the long term, through the core spread (inaudible) the portfolio.
>
> What's the takeaway? The takeaway from this slide is that, over time, Freddie has
> succeeded in generating good returns from both our guarantee and investment
> businesses while keeping our risk exposures very low. We're a high-leverage,
> low-risk operation. This strategy has enabled us to profit with others when times
> are good and to help keep serving our mission, strengthen consumer ties, and
> build market share when times are tough, like they are now.
>
> * * *
>
> I can't stress this too much. Whereas the returns available to us in the retained
> portfolio were relatively unattractive throughout the 2004 to 2006 time, and a lot
> of business returns were unattractive, the ROEs on new business we achieved in
> the last year have been much, much better. Now, while we're not aggressively
> growing the retained portfolio in the interest of being sure we keep our capital
> powder dry, we're not shrinking it either. And we've been able, as our assets roll
> over - about $10 billion a month rolls over through the retained portfolio - to
> replace that with more attractive business coming on.
>
> Finally, we feel that our credit position in the current guarantee book, actually, is
> very near the best of the entire industry. A very major reason for this is that we
> have very low exposures to alt A in risk-layered mortgage products in the
> guarantee business. We didn't do any subprime business. And, if you look at
> layered products and alt A, they together amount to about 9% of our total
> guarantee portfolio. As a result, thus far, we have a delinquency rate - a serious
> delinquency rate of about 51 basis points. The rate for the industry as a whole is
> about 100 basis points, or about 1%. So, if you look at that, and I think it is a

18

valuable lead indicator, it shows the relative - relative - security of our portfolio. Now, this combination of improved pricing and margins on new business with continued low risk in our existing portfolio is what we think bodes well for our future.

(Emphasis added.)

51.     Defendant Piszel continued discussing the Company's high credit quality during

the Goldman Sachs Conference, saying:

This next slide makes the point about the high credit quality of the overall retained portfolio. 99% of the portfolio is AAA or agency securities. We have no CDO exposure. At September 30, we had $105 billion - that is the orange - in AAA-backed ABS. We started the year at $125 billion, so that is paying off rather quickly. We also have $53 billion in alt A-backed ABS. Nearly all of the subprime and the alt A-backed is AAA, and both have significant subordination levels.

(Emphasis added.)

52.     On February 28, 2008, the Company filed its Information Statement and Annual

Report for Investors for the fiscal year ended December 31, 2007 ("2007 Information

Statement"). In the 2007 Information Statement, Freddie Mac made several statements regarding

the capital position and liquidity:

Because of our financial performance and our regular and significant participation as an issuer in the funding markets, our sources of liquidity have remained adequate to meet our needs and we anticipate that they will continue to be so.

* * *

We estimate at December 31, 2007 that we exceeded each of our regulatory capital requirements, in addition to the 30% mandatory target capital surplus.

* * *

If these measure are not sufficient to help us manage to the 30% mandatory target capital surplus, then we will consider additional measures in the future, such as

19

limiting growth or reducing the size of our retained portfolio, slowing issuances of
our credit guarantees, issuing preferred or convertible preferred stock, issuing
common stock or further reducing our common stock dividend.

(Emphasis added.)

    53.    In addition to statements about its capital position, Freddie Mac also discussed its

risk profile and underwriting standards in its 2007 Information Statement:

    Although Structured Transactions generally have underlying mortgage loans with
    a variety of risk characteristics, many of them may afford us credit protection from
    losses due to the underlying structure employed and additional credit enhancement
    features.

                                    * * *

    Between December 31, 2007 and February 25, 2008, credit ratings for
    mortgage-related securities backed by subprime loans with an aggregate unpaid
    principal balance of $16 billion were downgraded by at least one nationally
    recognized statistical rating organization. In addition, there were $5 billion of
    unrealized losses, net of tax, associated with AAA-rated, nonagency
    mortgage-related securities backed by subprime collateral that are principally a
    result of decreased liquidity in the subprime market. The extent and duration of
    the decline in fair value of these securities relative tour cost have met our criteria
    that indicate the impairment of these securities is temporary.

                                    * * *

    [I]n July 2007, we informed our customers of new underwriting and disclosure
    requirements for non-traditional mortgages. In September 2007, we informed our
    customers and other counterparties of similar new requirements for subprime
    short-term hybrid ARMs. These new requirements are consistent with our
    announcement in February 2007 that we would implement stricter investment
    standards for certain subprime ARMs originated after September 1, 2007, and
    develop new mortgage products providing lenders with more choices to offer
    subprime borrowers.

                                    * * *

    We seek to manage institutional credit risk on non-Freddie Mac mortgage-related
    securities by only purchasing securities that meet our investment guidelines and

                                    20

performing ongoing analysis to evaluate the creditworthiness of the issuers and servicers of these securities and the bond insurers that guarantee them. To assess the creditworthiness of these entities, we may perform additional analysis, including on-site visits, verification of loan documentation, review of underwriting or servicing processes and similar due diligence measures. In addition, we regularly evaluate our investments to determine if any impairment in fair value requires an impairment loss recognition in earnings, warrants and divestiture or requirements a combination of both.

54.    On February 28, 2008, the Company released a Supplement to its Information

Statement also dated February 28, 2008 ("February 28, 2008 Supplement"). The February 28,

2008 Supplement stated, in relevant part:

Looking ahead to 2008, Syron commented, "We remain extremely cautious as we enter 2008. If the economy weakens substantially from here - a possibility for which we need to be prepared as a company - it will have a further negative effect on homeowners across the country and drive credit costs higher. However, we have taken the steps to add capital, tighten our management of credit risk and institute pricing policies that are more consistent with the risk we bear. These actions should help us build the business for the future."

"With our large capital raise in the fourth quarter, we boosted our surplus relative to OFHEO's 30 percent mandatory target capital surplus," said Buddy Piszel, chief financial officer. "In 2008, we will continue to prudently manage our capital, particularly given the outlook for continued weakening in the housing market."

* * *

Estimated regulatory core capital was $37.9 billion at December 31, 2007, which represented an estimated $11.4 billion in excess of the company's regulatory minimum capital requirement, and an estimated $3.5 billion in excess of the 30 percent mandatory target capital surplus directed by the Office of Federal Housing Enterprise Oversight (OFHEO).

* * *

In 2007, Freddie Mac financed homes for approximately 3.6 million families. In addition to providing much needed liquidity, stability and affordability to the market, Freddie Mac has taken a leadership role in addressing some of the excesses of subprime lending, including taking early steps to enhance the level of underwriting standards in the market.

21

(Emphasis added.)

55.    On May 14, 2008, the Company issued a Supplement to its Information Statement

dated February 28, 2008 ("May 14, 2008 Supplement"). The May 14, 2008 Supplement stated, in

relevant part:

"Throughout the first quarter, Freddie Mac struck a careful balance of managing
risk and seizing business opportunities," said Buddy Piszel, chief financial officer.
"We continued to make prudent provision for credit losses, monitor our credit
book closely and maintain our disciplined approach to managing interest-rate and
other risks. Our credit guarantee business saw strong, high quality growth - and as
the quarter ended, we also were able to significantly ramp up our mortgage
purchase commitments for the retained portfolio.

"It's important to note that we began the year with a larger capital cushion
compared to a year earlier, and during the quarter we put that capital to work,
providing critically needed liquidity to the market and delivering attractive returns
on equity for our business," Piszel said. "Our plan is to raise new capital that will
not only enable us to continue to serve our mission and meet the housing market's
needs in this time of stress, but also to deploy that capital in a way that enhances
business flexibility and strengthens our capital position.

"We also made progress on a number of other important fronts, including
beginning our registration process with the Securities and Exchange Commission
and completing our remediation of all the previously identified material
weaknesses in our controls environment," Piszel added. "While our expectation is
for continued weakness in the housing and economic environment to negatively
impact our overall performance through the remainder of this year, we have put
Freddie Mac on a better foundation to manage through the current cycle and
emerge a successful, long-term competitor."

(Emphasis added.)

56.    On May 14, 2008, the Company also released its Financial Report for the Three

Months Ended March 31, 2008 as a Supplement to its Information Statement dated February 28,

2008 ("May 14, 2008 Financial Report"). The May 14, 2008 Financial Report stated, in relevant

part:

**Capital Adequacy**

On March 19, 2008, OFHEO, Fannie Mae and Freddie Mac announced an initiative to increase mortgage market liquidity. In conjunction with this initiative, OFHEO reduced our mandatory target capital surplus to 20% above our statutory minimum capital requirement, and we announced that we will begin the process to raise capital and maintain overall capital levels well in excess of requirements while the mortgage markets recover. We estimated at March 31, 2008 that we exceeded each of our regulatory capital requirements, in addition to the 20% mandatory target capital surplus.

* * *

**Mortgage Credit Risk**

Mortgage credit risk is primarily influenced by the credit profile of the borrower of the mortgage, the features of the mortgage itself, the type of property securing the mortgage and the general economic environment. To manage our mortgage credit risk, we focus on three key areas: underwriting requirements and quality control standards; portfolio diversification; and portfolio management activities, including loss mitigation and the use of credit enhancements.

All mortgages that we purchase for our retained portfolio or that we guarantee have an inherent risk of default. We seek to manage the underlying risk by adequately pricing for the risk we assume using our underwriting and quality control processes. Our underwriting process evaluates mortgage loans using several critical risk characteristics, such as credit score, LTV ratio and occupancy type.

Underwriting and quality standards

We use a process of delegated underwriting for the single-family mortgages we purchase or securitize. In this process, we provide originators with a series of mortgage underwriting standards and the originators represent and warrant to us that the mortgages sold to us meet these requirements. We subsequently review a sample of these loans and, if we determine that any loan is not in compliance with our contractual standards, we may require the seller/servicer to repurchase that mortgage or make us whole in the event of a default. In response to the changes in the residential mortgage market during the last year, we have made changes to our underwriting guidelines during the first quarter of 2008, which our seller/servicers must comply with for loans delivered to us for purchase or securitization. In February 2008, we announced that effective June 1, 2008 we would sharply reduce our purchases of mortgages with LTV ratios over 97%,

subject to exceptions for Home Possible mortgages with higher borrower credit
scores and certain mortgages with federal insurance or guarantees. Our Home
Possible program is designed to help finance first-time homebuyers by allowing
lower loan requirements for those meeting the eligibility criteria. We also
provided guidance on our pre-existing policy that maximum LTV ratios for many
mortgages must be reduced in markets where home prices are declining. In some
cases, binding commitments under existing customer contracts may delay the
effective dates of underwriting adjustments.

(Emphasis added)

57. On May 20, 2008, the Company participated in the Eleventh Annual Lehman

Financial Services Conference ("May 20, 2008 Conference"). During the conference, Defendant

Piszel stated, "we have a very solid capital base. At the end of the quarter, we were $5.5 billion -

actually, we were $6 billion higher than our regulatory minimum, and we announced a

commitment to raise about $5.5 billion in new capital, and that will enable us to be able to fund

growth and also give us downside protection," later continuing, "[a]t the end of the quarter, we

had $38 billion in regulatory capital. That was $11.5 billion over our statutory requirements, and

we believe our capital position is very strong and very sound."

58. On June 6, 2008, the Company held its Annual Stockholders' Meeting ("2008

Stockholders' Meeting"). At the meeting, Syron discussed the company's capital and explained

that the Company had acted "prudently and decisively to protect and bolster our capital." Later,

Syron stated, "The bottom line is that while our credit costs are increasing in this tough

environment, we believe they're manageable in any realistic scenario and mitigated by our

revenue growth going forward. Essentially, you have two buckets. You can think of the Freddie

going forward. We have these great opportunities, better pricing, better spreads lifting us up in

the drag down from some of the previous-year books." (Emphasis added.)

59.     On June 18, 2008, Don Bisenius, Freddie Mac's Senior Vice President of

Single-Family Credit Guarantee Business, delivered prepared remarks to the Federal Reserve

Board Advisory Council.  Bisenius stated:

> I mentioned that we are supporting the mortgage markets while keeping Freddie
> Mac safe and sound.  In the Single-Family business, this comes down to how well
> we manage credit and price for risk.  Here, we are following a two-fold approach:
> more stringent underwriting principles and more expansive risk-based pricing
>
> More stringent underwriting means staying away from certain lending practices
> that contributed to the housing bubble.  By that I mean staying away from loans
> with too many high-risk factors, such as 100 percent financing, with little or no
> documentation, to borrowers whose credit histories indicate that they are already
> stretched financially.  In industry jargon, this is known as "excessive risk
> layering."  In plain English, this is setting up a borrower for failure.  And we are
> saying "no" to this practice.

(Emphasis added.)

60.     These statements were materially false and misleading because: a) Defendants

misrepresented the Company's underwriting standards, risk management and the steps the

Company took to protect itself from losses associated with mortgage loans; b) Defendants

concealed the Company's holdings in highly risky and non-performing securities related to

residential mortgages, as well downplaying the Company's losses and write-downs associated

with those holdings; and c) Defendants misrepresented the adequacy of the Company's capital,

the extent to which its capital position had deteriorated and its lack of liquidity.

61.     Throughout the Class Period, Defendants Syron and Piszel signed certifications

that attested to the accuracy of the Company's Information and Proxy Statements.  Additionally,

during the Class Period, Defendants Syron and Piszel knowingly certified false and misleading

financial statements filed with the SEC.

## The Truth Emerges

62.     On June 25, 2008, the Company issued its May Monthly Volume Summary ("May Volume Summary") that revealed that it had increased its "retained portfolio" by an annualized rate of 53.4%. After the market closed on June 25, 2008, *Bloomberg News* reported that the "cost of protecting the debt of Freddie Mac" from default had risen to its highest rate in more than three months.

63.     On June 30, 2008, Mortgage Insurance Companies of America released information indicating that its members reported 67,967 defaults in May. According to the Associated Press, fears that Freddie Mac's and Fannie Mae's losses "could be worse were reinforced Monday as the Mortgage Insurance Companies of America, which represents companies PMI Group Inc. and MGIC Investment Corp. said defaults on loans backed by those companies rose to 68,000 in May, up 48 percent from a year earlier."

64.     On July 7, 2008, Lehman Brothers issued a report and said that a pending accounting change could force the Company to account for securitized assets on its balance sheet – potentially forcing Freddie Mac to boost its capital by $29 billion. Thomas Lawler, a former Fannie Mae portfolio manager and founder of Lawler Economic & Housing Consulting, commented that the accounting issue "piled on to other folks' previous estimates that the companies might be forced to take (losses)" on subprime and other risky mortgage assets.

65.     On July 10, 2008, former St. Louis Federal Reserve President William Poole told *Bloomberg News* that the Company was "insolvent" under fair accounting rules and that it may need a government bailout.

66.    On July 11, 2008, The New York Times published an article titled "U.S. Weighs

Takeover of Two Mortgage Giants," which stated in part:

> Alarmed by the growing financial stress at the nation's two largest mortgage
> finance companies, senior Bush administration officials are considering a plan to
> have the government take over one or both of the companies and place them in a
> conservatorship if their problems worsen, people briefed about the plan said on
> Thursday.

67.    On July 13, 2008, Treasury Secretary Henry M. Paulson stated:

> [W]e must take steps to address the current situation as we move to a stronger
> regulatory structure. In recent days, I have consulted with the Federal Reserve,
> OFHEO, the SEC, Congressional leaders of both parties and with the two
> companies to develop a three-part plan for immediate action. The President has
> asked me to work with Congress to act on this plan immediately. First, as a
> liquidity backstop, the plan includes a temporary increase in the line of credit the
> GSEs have with Treasury. Treasury would determine the terms and conditions for
> accessing the line of credit and the amount to be drawn. Second, to ensure the
> GSEs have access to sufficient capital to continue to serve their mission, the plan
> includes temporary authority for Treasury to purchase equity in either of the two
> GSEs if needed. Use of either the line of credit or the equity investment would
> carry terms and conditions necessary to protect the taxpayer. Third, to protect the
> financial system from systemic risk going forward, the plan strengthens the GSE
> regulatory reform legislation currently moving through Congress by giving the
> Federal Reserve a consultative role in the new GSE regulator's process for setting
> capital requirements and other prudential standards. I look forward to working
> closely with the Congressional leaders to enact this legislation as soon as possible,
> as one complete package.

68.    On July 30, 2008, President Bush signed a bill authorizing a bailout of Freddie

Mac by the taxpayers. Specifically, it provided Freddie Mac with an unlimited line of credit at

the U.S. Treasury and authorized the Treasury to purchase shares in Freddie Mac if necessary.

Any such investment would necessarily be senior in status to existing investments in the

company, and the possibility of action by the Treasury Department depressed the value of

existing investments in the Company, including the Series Z preferred stock.

27

69.     On August 6, 2008, the Company announced its second quarter 2008 financial

results, reporting a net loss of $821 million, compared to a net loss of $151 million for the same

period a year earlier. Freddie Mac also announced that it had increased its reserve for credit

losses by $2.5 billion, more than double the amount set aside in the first quarter. Meanwhile,

Fitch Ratings lowered Freddie Mac's preferred stock to A from A+ and placed it on ratings watch

negative.

70.     On September 7, 2008, the Federal Housing Finance Agency announced its

decision to place Fannie Mae and Freddie Mac into conservatorship. That same day,

*MarketWatch* issued an article entitled "Washington takes over Freddie Mac, Freddie Mac - End

of an era comes, as Paulson says equity buy wouldn't have been enough," which stated in part:

> In the biggest government bailout in U.S. history, the Treasury said Sunday that
> regulators are seizing control of home mortgage giants Freddie Mac and Fannie
> Mae. Under a sweeping plan, the two companies will be run by the government
> indefinitely, with the two current chief executives to be replaced and the
> government investing up to $100 billion in each firm to keep them solvent.

> The Treasury said that stock in the company will continue to trade, although
> powers of stockholders will be suspended until government control ends.

>  In order to improve the availability of mortgages, Treasury will start buying
> Freddie and Fannie's mortgaged-backed debt in the open market. The companies
> will also end all lobbying of the government and eliminate dividends.

\*          \*          \*          \*          \*

**Necessary action**

> The end for Fannie and Freddie's independence came shortly after 11:00 am, when
> Treasury Secretary Henry Paulson told reporters that a careful review of the two
> mortgage giant's books made it "necessary to take action."

\*          \*          \*          \*          \*

28

There were reports that auditors called in by Treasury and FHFA had found accounting irregularities at the two firms and that their capital base was smaller than expected.

At first, Paulson had talked in terms of an equity investment in the two firms. But after the review, a full-scale takeover of the two firms was seen as the only option.

*          *          *          *          *

**FHFA in charge, CEOs leaving**

Technically, the government placed the two companies in conservatorship.

The FHFA will assume the power of the board and management.

Paulson said the move won't eliminate Freddie and Fannie's common stock, but "does place common shareholders last in terms of claims on the assets of the enterprises."

Preferred stock shareholders will be "second, after the common shareholders, in absorbing losses," he said.

One quirk in the plan is that Treasury will allow Fannie and Freddie to actually increase their mortgage portfolios over the next year.

The move will also replace the chief executives of both Fannie Mae and Freddie Mac.

Fannie Mae Chief Executive Daniel Mudd and Freddie Mac CEO Richard Syron will leave their positions after a brief transitional period.

Mudd will be replaced by Herb Allison, the former vice chairman of Merrill Lynch, and the former chairman of the TIAA-CREF teachers' pension funds.

*          *          *          *          *

Under the agreement, Treasury will immediately receive warrants to purchase common stock of each company representing 79.9% of the common stock of each firm.

Treasury will also receive $1 billion of senior preferred stock in each firm.

All dividends for preferred stockholder has been suspended, a move which prompted S&P to cut its rating on Fannie and Freddie's preferred stock to junk

29

grade. . . .

71.    *The New York Times* later ran an article entitled "Mortgage Giant Overstated the

Size of Its Capital Base" that stated in part:

> Fannie Mae and Freddie Mac have also inflated their financial positions by relying
> on deferred-tax assets - credits that the companies have built up over the years that
> can be used to offset future profits. Fannie maintains that its worth is increased by
> $36 billion through such credits, and Freddie argues that it has a $28 billion
> benefit.
>
> But such credits have no value until the companies generate a profit - something
> they have failed to do over the last four quarters, and something that is
> increasingly unlikely within the next year. Moreover, even when the companies'
> profits soared, such credits were often unusable because the companies also had
> large numbers of affordable housing tax credits, which themselves offset profits.
>
> One analyst estimates the companies, in the future, would have to collect roughly
> double the profits of the past five years for the credits to become usable. Most
> financial institutions are not allowed to count such credits as assets in the manner
> used by Fannie and Freddie.
>
> Regulators and auditors may question the companies' use of deferred-tax credits
> because they cannot be sold to anyone else and they would disappear in a
> receivership. And, if those credits were not counted as assets, both companies
> would probably fall below the capital threshold they are required to hold.
>
> Finally, regulators are said to be scrutinizing whether the companies were trying
> to manage their earnings by maneuvering the timing of reserves set aside to offset
> losses from defaulted loans. Each quarter, both companies have gradually
> increased their loss reserves - Fannie's reserves today stand at $8.9 billion, and
> Freddie's at $5.8 billion. However, regulators and auditors felt strongly that both
> companies should have identified larger potential losses immediately, and set
> aside much more from the beginning.
>
> Other companies, like private mortgage insurers, have identified much larger
> losses and have set aside much larger amounts of capital. Fannie and Freddie,
> however, have delayed the recognition of such losses, dribbling out bad news with
> each quarterly announcement, suggesting a strategy to manage the recognition of
> losses.

72.     On September 9, 2008, *Bloomberg News* published an article entitled "Fannie

Mae, Freddie 'House of Cards' Prompts Takeover," and stated in part:

> "Fannie and Freddie's accounting during the housing crisis appears to have been
> more fantasy than reality," said Rosner, who first highlighted problems in 2003,
> before the two companies were forced to restate about $11.3 billion in earnings.

> \*              \*              \*              \*              \*              \*

> After looking through the finances, Fed examiners deemed their capital reserves
> too low, Dallas Fed President Richard Fisher said yesterday.

> "We concluded that the capital of these institutions was too low relative to their
> exposure," Fisher said in response to an audience question after a speech in
> Austin, Texas.  Further, "that capital in and of itself was of low quality."

73.     Freddie Mac internal documents produced to the House Oversight and

Government Reform Committee reveal that, as early as 2004, Freddie Mac knew that its lax

underwriting standards, virtually non-existent risk management procedures and resulting

purchase of low-quality, risky mortgages and mortgage-backed securities, had left it dangerously

exposed to massive losses.

74.     For example, David Andrukonis, while Freddie Mac's Chief Compliance Officer,

was highly critical of senior management's lax underwriting standards and the increased risk

created from Freddie Mac's subprime and Alt-A lending.  In an April 1, 2004 letter to Tracy

Mooney, a colleague at Freddie Mac, Andrukonis complained that "while you, Don, and I will

make a case for sound credit, it's not the theme coming from the top of the company and

inevitably people down the line play follow the leader."

75.     Syron also received warnings from Freddie Mac's head of compliance and

oversight, Donald Solberg, who advised Syron that the Company's capital base needed to be

replenished.

76.     Donald Bisenius, Freddie Mac's Senior Vice President of Single-Family Credit Guarantee, sent an April 1, 2004 to Michael May, then the Senior Vice President of Mortgage, Operations & Funding at Freddie Mac, stating: "we did no-doc lending before, took inordinate losses and generated significant fraud cases ?. . . I'm not sure what makes us think we're so much smarter this time around."

77.     In an April 5, 2004 email from Andrukonis to Paul Peterson, Andrukonis recalled Freddie Mac's historical problems with similar loans: "In 1990 we called this product 'dangerous' and eliminated it from the marketplace." Andrukonis understood that GSEs had the power to influence market standards and, in his letter to Peterson, voiced the opinion that, "I'm not convinced we aren't leading the market into this product."

78.     According to The New York Times, Syron received another memorandum from Andrukonis in mid-2004, advising him "that [Freddie Mac's] underwriting standards were becoming shoddier and the company was becoming exposed to losses." Andrukonis said the loans "would likely pose an enormous financial and reputational risk to the company and the country." However, when they later sat in a conference room to discuss these concerns, Syron reportedly refused to consider possibilities for reducing Freddie Mac's risks and, according to Andrukonis, said that Freddie Mac "couldn't afford to say no to anyone." Over the next three years, Freddie Mac continued buying riskier loans.

79.     In September 2004, Donna Cogswell, a colleague of Andrukonis at Freddie Mac, sent an email to Syron, Cook, May and Andrukonis, amongst others, and urged Freddie Mac's senior management to stop funding "No Income/No Asset" loans or "NINA" loans. Cogswell

warned that NINA loans targeted "borrowers who would have trouble qualifying for a mortgage if their financial position were adequately disclosed" and that the "potential for the perception and the reality of predatory lending with this product is great."

80.     Later that day, May sent an email to Andrukonis addressing Cogswell's concerns and stated: " Wow. This seems a bit premature. I am not sure what you are trying to accomplish . . . I would have expected you to wait until we had made a decision and a firm recommendation and then perform an oversight role on that decision." Andrukonis then responded:

> At last week's risk management meeting I mentioned that I had reached my own conclusion on this product from a reputation risk perspective. I said that I thought you or Bob Tsien had the responsibility to bring the business recommendation to Dick [Syron], who was going to make the decision. Marty and Patti asked me what it meant that I opposed this product. I said that my job was to speak out to Dick and then to the Board if I thought we were in the wrong place on business or reputation risk. I think of this letter as comparable to the one Don B sent Paul. What I want Dick to know is that he can approve of us doing these loans, but it will be against my recommendation. I wouldn't be surprised if he disagrees with my conclusion.

 (Emphasis added.) A copy of the internal email chain, produced to the House Committee on Oversight and Governmental Reform, is attached hereto as Exhibit A.

81.     On October 6, 2004, Michael May wrote a memorandum to Defendant Syron and Gene McQuade, then President and COO of Freddie Mac, addressing the risks associated with Freddie Mac's increasing acquisition of NINA Mortgages. May wrote: "Due to the reputation, fraud, predatory lending and credit risks posed by our current programs, time is of the essence. Freddie Mac must choose to either modify our business practices to mitigate risks and continue purchasing NINA mortgages or exit the NINA market completely." A copy of the October 6, 2004 email, produced to the House Oversight Committee, is attached hereto as Exhibit B.

82.     Ultimately, the Individual Defendants rejected the recommendations of Cogswell, May and Andrukonis, Freddie Mac's long time Chief Risk Officer, and Andrukonis was then fired. Instead, with full knowledge and understanding of the risks, Freddie Mac's senior management decided to "continue business as usual." In testimony before the House Oversight Committee, Charles W. Calomiris, the Henry Kaufman Professor of Financial Institutions at Columbia Business School, detailed the scheme.  Referencing internal documents from Freddie Mac, Professor Calomiris concluded:

> The emails, in particular, provide clear and unambiguous support for the proposition that Freddie Mac consciously undertook the acquisition of loans with poor underwriting processes in spite of factual evidence, both from the past and the current market experience, that led its own risk managers to recommend raising auditing standards and scaling back their involvement in these loans. . . . These various statements from Freddie Mac's risk managers in 2004 – which were made before the massive increases in subprime and Alt-A lending that occurred in 2005, 2006 and early 2007, which produced our current financial crisis – now sound a bit like Cassandra's advice to Agamemnon that his palace wasn't really a very sage place to have a nap.

Professor Calomiris concluded, "not surprisingly, the GSES [Freddie Mac and Fannie Mae] did not disclose the extent of their subprime and Alt-A exposures to the market."

83.     In sum, despite their awareness of increasing reputation, fraud, predatory lending and credit risks posed by Freddie Mac's loan practices and portfolio, the Individual Defendants took no action to minimize these risks.  Worse yet, all Defendants, fully aware of these risks and Freddie Mac's blissful disregard thereof, failed to disclose them to investors.

84.     Instead, Freddie Mac increased its risk exposure, degrading its capital position.  In 2007 alone, Freddie Mac expanded its retained portfolio by approximately $17 billion, which increased its mortgage holdings by 2.4%.  At the same time, the Company's underwriting

34

standards and risk management procedures became shoddier, so that more of the loans Freddie
Mac added to its portfolio were low quality, high credit risk mortgages. Freddie Mac's capital
base also grew weaker as the Company's mortgage-related losses ballooned.

85.     This downturn decreased the value of the mortgage-backed securities held by
Freddie Mac as the chance of defaults increased. It also increased the likelihood that Freddie
Mac would have to make good on its guarantees of mortgage-backed securities held by others.
This simultaneous decline in assets and increases in liabilities rendered the Company massively
undercapitalized.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

86.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil
Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or
otherwise acquired Freddie Mac's 8.375% Fixed to Floating Rate Non-Cumulative Perpetual
Preferred Stock Series Z from November 29, 2007 to September 6, 2008, and who were damaged
thereby (the "Class"). Excluded from the Class are defendants, the officers and directors of the
Company, members of their immediate families and their legal representatives, heirs, successors
or assigns and any entity in which defendants have or had a controlling interest.

87.     The members of the Class are so numerous that joinder of all members is
impracticable. Throughout the Class Period, Freddie Mac's Series Z preferred stock was actively
traded on the New York Stock Exchange ("NYSE"). While the exact number of Class members
is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery,
Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record
owners and other members of the Class may be identified from records maintained by Freddie

35

Mac or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

88.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

89.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether defendants violated the federal securities laws by defendants' acts as alleged herein;

(b)     whether defendants failed to make material statements to the investing public during the about the business, operations and management of Freddie Mac;

(c)     whether the statements made by defendants to the investing public during the Class Period exacerbated their omissions and further misrepresented material facts about the business, operations and management of Freddie Mac; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

90.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

36

burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

91.    As a result of these materially false and misleading statements and failures to disclose, Freddie Mac's preferred stock traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired Freddie Mac's preferred stock relying upon the integrity of the market price of Freddie Mac's preferred stock and market information relating to Freddie Mac, and have been damaged thereby.

**LOSS CAUSATION**

92.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of Freddie Mac's preferred stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

93.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Freddie Mac's financial well-being, business position, and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Freddie Mac and its financial well-being, business position

and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

94.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

95.    During the Class Period, Plaintiffs and the Class purchased securities of Freddie Mac at artificially inflated prices and were damaged thereby. The price of Freddie Mac's preferred stocks significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

96.    At all relevant times, the market for Freddie Mac's preferred stock was an efficient market for the following reasons, among others:

(a)    Freddie Mac's preferred stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, Freddie Mac filed periodic public reports with the SEC and the NYSE;

(c)    Freddie Mac regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press

and other similar reporting services; and

(d)     Freddie Mac was followed by several securities analysts employed by major
        brokerage firms who wrote reports which were distributed to the sales force and
        certain customers of their respective brokerage firms. Each of these reports was
        publicly available and entered the public marketplace.

97.     As a result of the foregoing, the market for Freddie Mac's preferred stocks
promptly digested current information regarding Freddie Mac from all publicly-available sources
and reflected such information in Freddie Mac's preferred stock price. Under these
circumstances, all purchasers of Freddie Mac's preferred stock during the Class Period suffered
similar injury through their purchase of the Company's securities at artificially inflated prices and
a presumption of reliance applies.

98.     Additionally, throughout the proposed Class Period, Freddie Mac and Defendants
failed to disclose the following material information known to them:

(1)     Freddie Mac was exposed to massive mortgage-related losses;

(2)     had debilitating deficiencies in its underwriting and risk-management procedures;

(3)     was and would remain after the Offering woefully undercapitalized; and most
        importantly,

(4)     faced imminent insolvency.

99.     On July 30, 2008, only seven months after the Offering, President Bush signed a
housing rescue bill which included a Freddie Mac (and Fannie Mae) bail out. It provided
Freddie Mac and Fannie Mae with an unlimited line of credit at the U.S. Treasury (increased
from $2.25 billion) and authorized the U.S. Treasury to purchase equity shares in the two entities,

39

if necessary.

100.    On September 7, 2008, only nine months after the Offering, and less than two months after providing Freddie Mac with an unlimited line of credit, federal regulators seized control of Freddie Mac and Fannie Mae in order to avert their financial collapse. It is the biggest U.S. government bailout in history.

## NO SAFE HARBOR

101.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements, because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Freddie Mac who knew that those statements were false when made.

40

## FIRST CLAIM

## Against All Defendants For Violations of §10(b) of the Securities Exchange Act and Rule 10b-5 thereunder

102.    Plaintiffs incorporate by reference all the preceding paragraphs.

103.    During the Class Period, the Individual Defendants and Underwriter Defendants created, disseminated and approved all of the materially misleading statements specified above. They knew or should have known that their statements and omission were misleading, yet intentionally and recklessly withheld omitted information and exacerbated those omissions with misrepresentations.

104.    Defendants violated § 10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Freddie Mac publicly traded securities during the Class Period.

105.    Plaintiffs and the Class have suffered damages in that, in reliance on Defendants' statements and omissions, as well as the integrity of the market, they paid artificially inflated prices for Freddie Mac publicly traded securities. Plaintiffs and the Class would not have purchased Freddie Mac publicly traded securities at the prices they paid, or at all, if they had full disclosure and been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

41

106.    Defendants' misstatements and omissions concerned facts that ultimately caused Plaintiffs' losses.

## SECOND CLAIM

### For Violation of Section 20(a) of
### The Securities Exchange Act Against The Individual Defendants

107.    Plaintiffs incorporate by reference all the preceding paragraphs.

108.    This claim is asserted by Plaintiffs against the Individual Defendants.

109.    The Individual Defendants acted as controlling persons of Freddie Mac within the meaning of §20(a) of the 1934 Act. By reason of their positions with the Company, and their ownership of Freddie Mac stock, the Individual Defendants had the power and authority to cause Freddie Mac to engage in the wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the 1934 Act.

110.    As a direct and proximate result of the Individual Defendants' acts and omissions in violation of the Securities Act, the market price of Freddie Mac's preferred stock sold was artificially inflated, and Plaintiffs and the Class suffered substantial damage in connection with their ownership of Freddie Mac's preferred stocks pursuant to the Circular Offering.

111.    Syron, along with the other Individual Defendants, was responsible for ensuring the accuracy of Freddie Mac's public financial reports and other public statements. Syron publicly commented on Freddie Mac's financial performance in its quarterly and annual earnings press releases, in investor conference calls held during the Class Period, and during interviews with the media. Syron signed certifications attesting to the accuracy of the Company's 2006 Information Statement dated March 23, 2007 and all supplements, the Company's 2007 Information Statement dated February 28, 2008 and all supplements, the Company's Proxy

42

Statement dated May 7, 2007, and the Company's Proxy Statement dated April 29, 2008.

112.    Cook, along with the other Individual Defendants, was responsible for ensuring the accuracy of Freddie Mac's public financial reports and other public statements. Cook publicly commented on Freddie Mac's financial performance in press releases, conference calls, articles and other public presentations and speeches held during the Class Period.

113.    As CFO, Piszel was responsible for the Company's financial controls and financial reporting. He, along with the other Individual Defendants, was responsible for ensuring the accuracy of Freddie Mac's public financial reports and other public statements. Piszel signed certifications attesting to the accuracy of the Company's 2006 and 2007 Information Statements and Supplements thereto.

114.    As officers of a publicly-held company traded on the NYSE, the Individual Defendants possessed the power and authority to control the content of Freddie Mac's public Information Statements and Supplements and statements or reports made in press releases, conference calls, news articles and/or other public forums. Each Individual Defendant had a duty to disseminate accurate and truthful information with respect to the Company's financial condition, liabilities, interest, earnings and present and future business prospects, and to correct any previously issued statements that were erroneous.

115.    The Individual Defendants, because of their positions as officers and/or directors of the Company, were able to, and did, control the content of the various Information Statements and Supplements, press releases and other public statements pertaining to the Company during the Class Period. Because of their positions at Freddie Mac and their access to material non-public information, each of the Individual Defendants knew that the adverse facts specified

herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were thus materially false and misleading.

116.   As a result of the foregoing, each of the Individual Defendants was and is responsible for the accuracy of the public Information Statements and Supplements, press releases and other Company statements as detailed herein, which were the result of the collective actions of the Individual Defendants, and are personally liable for the misrepresentations and omissions contained herein.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs prays for relief and judgment, as follows:

A.   Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.   Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.   Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.   Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demands a trial by jury.

Dated:  January 28, 2009                    Respectfully submitted,

By:  _____

**COTCHETT, PITRE & McCARTHY**
Steven N. Williams (SW-6198)
100 Park Avenue, Suite 2600
New York, NY 10017
Phone: (212) 682-3198
Fax:     (212) 661-8665

Attorneys for Adam Kreysar and Tina Kreysar

45

## PLAINTIFFS' CERTIFICATE

The undersigned ("Plaintiffs") declare, as to the claims asserted under the federal securities laws, that:

1.      Plaintiffs have reviewed the complaint against the Federal Home Loan Mortgage Corp ("Freddie Mac") and certain other defendants.

2.      Plaintiffs did not acquire the security that is the subject of this action at the direction of Plaintiffs' counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiffs are willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiffs will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiffs' pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as approved by the court.

5.      Plaintiffs made the following transactions during the Class Period in the Series Z preferred shares of Freddie Mac:

| Purchases | | |
|-----------|------------------|---------|
| Date(s) | Number of Shares | Price |
| 2/13/2008 | 3,800 | $26.79 |

| Sales | | |
|-----------|------------------|---------|
| Date(s) | Number of Shares | Price |
| 9/17/2008 | 3,800 | $0.98 |

6.      During the three years prior to the date of this Certification, Plaintiffs have not sought to serve or served as a representative party for a class in an action filed under the federal securities laws.

7.      We declare under penalty of perjury that the information above is accurate. Executed this __19__ day of December in Fort Lauderdale, Florida.

Adam Kresyar                                           Tina Krasyar

# Exhibit A

| From: | David A Andrukonis |
| --- | --- |
| Sent: | Wednesday, September 8, 2004 9:26 AM |
| To: | Mike May |
| Subject: | Re: No Income/No Asset(NINA) Mortgages |

Mike,

At last week's risk management meeting I mentioned that I had reached my own conclusion on this product from a reputation risk perspective. I said that I thought you and/or Bob Tsien had the responsibility to bring the business recommendation to Dick, who was going to make the decision. Marty and Patti asked me what it meant that I opposed this product. I said that my job was to speak out to Dick and then to the Board if I thought we were in the wrong place on business or reputation risk. I think of this letter as comparable to the one Don B sent Paul. What I want Dick to know is that he can approve of us doing these loans, but it will be against my recommendation. I wouldn't be surprised if he disagrees with my conclusion. The "as soon as practicable" phrase was to reflect the fact that business realities may dictate the timing of our action, even if you agree with my position. I think I would wait for the business if it were a line we were contemplating entering. But since we've been in this one for some time, I think I should speak as soon as I reach a conclusion. In writing it I actually felt more like I was late. Let's talk.

DA

Mike May
09/07/2004 06:43 PM
To: David A Andrukonis
cc:
Subject: Re: No Income/No Asset(NINA) Mortgages

Wow.

This seems a bit premature. I am not sure what you are trying to accomplish......I would have expected you to wait until we had made a decision and a firm recommendation and then perform an oversight role on that decision.

I will call you and discuss this when we both have a chance.

Mike May
Mortgage Sourcing, Operations and Funding
Committed to Integration and Execution
Office:
Fax:
Cell:

David A Andrukonis
Sent by: Donna L Cogswell

CONFIDENTIAL & PROPRIETARY

FMAC0013803

09/07/2004 04:41 PM
To: Dick Syron███████████████ █Mike May███████████████████Robert █████
Tsien███████████████Patricia Cook███████████████████Clarke D█████
Campe████████████, Susan W Gates██████████████
cc: David A Andrukonis███████████████
Subject: No Income/No Asset(NINA) Mortgages

The purpose of this e-mail is to document my recommendation regarding NINA
mortgages. I've come to my conclusion after studying data from three major
lenders and comparing notes with other risk managers in the industry. Mike May
and Bob Tsien are working to get this issue before you formally in the near
future.

Recommendation

Freddie Mac should withdraw from the NINA market as soon as practicable. Our
presence in this market is inconsistent with a mission-centered company and
creates too much reputation risk for the firm.

Background

The NINA mortgage was created over 20 years ago as a way of serving borrowers
with inconsistent income patterns (actors, the self employed, etc.) but strong
credit profiles and downpayments. In addition, the product served borrowers
who, for whatever reason, did not want to report their income. Over time,
other mortgage products and underwriting practices evolved, making NINA
mortgages less common. Specifically, Freddie Mac's Loan Prospector and other
automated underwriting services began to recognize that income was less
predictive of default than previously thought, and consequently traditional
guidelines around housing expense to income ratios were eased. Other mortgage
products, such as stated income/stated asset (SISA) mortgages, arose that
accommodated borrowers who didn't want to be hassled with providing their
income.

The NINA product we are being sold today differs substantially in the niche it
is trying to reach. Today's NINA appears to target borrowers who would have
trouble qualifying for a mortgage if their financial position were adequately
disclosed. The best evidence of this is the first year delinquency rates on
these mortgages, which range from 8 to 13%, depending on the lender. We
conducted a quality control review of NINA loan files and found that nearly
two-thirds of the time a spouse was dropped from the note. This means that the
borrower with the weaker credit score was probably not adequately considered in
the underwriting process. Our underwriting system uses credit data from both
spouses, when available, because we have found the weaker borrower to be
predictive of default. Typically, borderline borrowers need both incomes to
meet minimum income thresholds. However, since, by definition, NINA mortgage
underwriting ignores income, originators can advise spouses with weaker credit
to only include the stronger of the two borrowers on the application.

An additional problem with these mortgages is that it appears they are
disproportionately targeted towards Hispanics. The potential for the
perception and the reality of predatory lending with this product is great. In
2003, 5.5% of Freddie Mac single-family loans were made to Hispanics. This
compares with 18% of the NINA type loans we sampled that went to Hispanics.

CONFIDENTIAL & PROPRIETARY

FMAC0013804

The HMDA data paint a similar picture with 16% of no income documentation loans going to Hispanics, versus 10% of total conforming mortgages.

Exiting the NINA market would be difficult and expensive, but there is also an opportunity. Certainly lenders would criticize us because our withdrawal might affect their margins on this business. Freddie Mac would also stand to lose $25 to 50 million in annual profits. Finally, since NINA loans are minority rich, it will make it even more difficult to match the private market level of minority and underserved mortgage production.

On the other hand, what better way to highlight our sense of mission than to walk away from profitable business because it hurts the borrowers we are trying to serve? What better way to highlight the problem with linking the assessment of our progress to hitting the HMDA data? In my judgment, matching the market's production of underserved and minority borrowers will require us to engage in market practices that are at odds with our charter if it requires us to make a market in NINA mortgages.

CONFIDENTIAL & PROPRIETARY

# Exhibit B

| To | Date |
|---|---|
| Dick Syron and Gene McQuade | October 6, 2004 |
| From | Subject |
| Mike May | No Income/No Asset (NINA) Mortgages |

## ACTION REQUESTED

The purpose of this memo is to request a decision about Freddie Mac's purchase of NINA mortgages and investment in securities backed by NINA mortgages. Due to the increased reputation, fraud, predatory lending and credit risks posed by our current programs, time is of the essence. Freddie Mac must choose to either modify our business practices to mitigate risks and continue purchasing NINA mortgages or exit the NINA market completely. I plan to bring this issue to the October BEC meeting where we can discuss it in more detail.

## EXECUTIVE SUMMARY

Freddie Mac has come to a critical crossroads on a controversial mortgage product – NINA mortgages. NINA mortgages create dynamic tension between key corporate goals and objectives: meeting customer needs, market share, expanding homeownership, managing credit risk, and corporate reputation. NINAs pose higher risks and can be vulnerable to predatory and/or fraudulent practices. During the past several weeks, there has been vigorous debate within the Corporation regarding whether or not Freddie Mac should continue purchasing NINA mortgages and investing in securities backed by NINA mortgages. After much discussion and debate, I recommend that Freddie Mac continue to purchase NINA mortgages and securities backed by NINA mortgages if we complete the following: require borrower disclosure; establish maximum LTV limit of 90%; require new appraisal requirements; promote Freddie Mac's leadership of a task force – comprised of key industry representatives, including the MBA, and adopt their recommendations.

## BACKGROUND

The NINA mortgage was created as an additional documentation option for consumers who cannot, for whatever reason, provide personal financial information. Typically, this product serves borrowers with inconsistent income patterns (self employed, etc.) but with strong credit profiles and substantial down payments. Under this mortgage offering, borrowers do not disclose income or assets to the lender – the borrower's ability to repay the loan is not analyzed or considered.

Understanding the legitimate marketplace need that NINA mortgages provide is difficult to ascertain, without knowing what the borrower and originator motivations were during the origination of the mortgage. Some lenders have stated that NINA mortgages provide access to mortgage financing for borrowers who may have difficulty legitimately documenting their income and/or assets and, for whatever reason, do not want to report their income. For example:

* Borrowers with non-traditional or cash income
* Borrowers with multiple self-employed income sources
* Retirees with substantial assets
* Borrowers relying on rental income, particularly those who rent a portion of their home
* Borrowers who, for cultural reasons, do not trust financial institutions

However, the opposing view questions the need for this product in today's marketplace that offers various alternative documentation mortgages, particularly stated income/stated assets (SISA) mortgages. SISA mortgages serve the same needs outlined above – as an option for borrowers who chose not to, or cannot legitimately, fully document their income and/or assets. SISA differs from NINA in that the borrowers capacity to repay the debt, along with their financial ability to contribute the required equity down payment, can be analyzed as part of the loan origination process.

CONFIDENTIAL & PROPRIETARY

**BACKGROUND** (continued)

Recently, we embarked on an effort to expand our flow offerings for SISA with the intent of streamlining deliveries of this product to us by more lenders. In addition, other mortgage products and underwriting practices have evolved, making the market niche that NINA mortgages traditionally served less unique.

**DISCUSSION**

During the past several months, new information emerged about NINA mortgages in the following venues, which heightened concerns with Freddie Mac's fraud, predatory lending, reputation and credit risks:

- Mortgage Insurers have stated publicly that the performance of NINAs is poor.
- Consumer media – Ken Harney featured the risks associated with NINAs.
- Anecdotal information provided by a large customer indicates that NINAs are sometimes used to keep rejection rates constant. In addition, they noted NINAs are by far and away the worst performing of alternative documentation mortgages.
- Several issues surfaced with NINA mortgages sold to us by GreenPoint.

In response, we conducted a research effort to examine this product. Given the limits of our analysis, due to sample size, it is difficult to reach solid conclusions. However, the following additional concerns were brought to light:

- Some lenders have expanded the market for NINA mortgages by raising the maximum loan-to-value ratio and lowering credit score requirements.
- Quality control reviews highlighted origination practices that raise concerns; lack of consistent borrower disclosure; instances where borrowers are "coached" to lose their income information after it is known that they did not qualify for their mortgage using standard documentation; nearly two-thirds of married borrowers in our sample had a spouse dropped from the note -- which means that the spouse with the weaker credit score may not have been evaluated during the underwriting process.
- . NINA borrower profile has changed from largely self-employed to salaried or fixed income.
- It appears NINAs may be targeted to Hispanics. This increases the risk that this product may be associated with predatory lending.

To avoid facing increased predatory lending and reputation risks, Enterprise Risk Oversight (ERO) is recommending that Freddie Mac cease purchasing NINA mortgages. However, there are a number of concerns associated with this approach:

- Freddie Mac's Alt-A purchases, via the bulk transaction path, were $3.5 BB between January and July of 2004. The retained portfolio purchased an estimated $1BB in NINA mortgages. NINAs are an integral part of our Alt-A transactions (bulk and retained) – if we cease to purchase them, the entire Alt-A business is at risk due to the fact that NINA mortgages are bundled into the Alt-A transactions.
- PVA impact of the Alt-A bulk and retained portfolio transactions for the entire year is estimated between $25 MM and $75 MM – best estimate of $50 MM.
- In addition to the possible loss of the Alt-A bulk business, leaving the NINA market will have negative impacts on key customer relationships and business volumes; standard and alternative documentation volume goals are placed in jeopardy.
- Eliminating or substantially reducing our purchases of NINA mortgages will increase the competitive gap between Freddie Mac and Fannie Mae – they purchase NINA mortgages as well.
- The Alt-A bulk business makes a contribution to our HUD goals. This year, the Alt-A bulk transactions contribute 2 basis points toward achieving our Low/Mod goals, 5 basis points to our Special/Affordable goals, and 40 basis points to our Underserved GSE goals. During 2003, the Alt-A bulk business contributed 10 basis points to our Low/Mod and Special/Affordable goals. However, NINA loans by themselves have a negative impact to goals due to the fact that borrower income is not disclosed.

CONFIDENTIAL & PROPRIETARY

## DECISION OPTIONS

Freddie Mac has three options:

1. Continue purchasing NINA mortgages without changing business practices
   - Risks: this option will not protect Freddie Mac from reputation, fraud, predatory lending and credit risks. Continuing business "as usual" is not wise given the concerns raised with this product and given our tradition of anti-predatory leadership.
2. Cease purchasing NINA mortgages entirely
   - Risks: this option presents risks to market share, customer relationships, HUD goals, and negative impact to PVA. In addition, leaving the NINA market provides Freddie Mac very little leverage to lead changes in the alternative documentation market.
3. Continue purchasing NINA mortgages with required changes to business practices.
   - Risks: credit, fraud, predatory lending and reputation risks remain. However, the implementation of appropriate modifications to business practices will mitigate them.

## RECOMMENDATION

I recommend that Freddie Mac continue to purchase NINA mortgages (option three). This option positions Freddie Mac as a flexible business partner, maintains present value add, provides HUD goal benefits, mitigates marketplace perceptions that Freddie Mac is ceding the non-traditional marketplace to Fannie Mae, and serves as a venue for the firm to promote responsible market leadership. My recommendation is conditional upon the following:

- We will implement a policy, for NINA mortgages and securities backed by NINA mortgages purchased by Freddie Mac, that requires the consistent use of borrower disclosure. This disclosure, the language of which must be approved by legal, will be signed by the borrower and retained in the mortgage file, will include statements that acknowledge that the borrowers have selected a No Income/No Asset mortgage and that they have not been coached or otherwise coerced into this product. The borrower disclosure will include an acknowledgement that had they provided their income and asset information to their mortgage lender, they may have been eligible for a lower mortgage rate. In addition, the disclosure must make it clear that because the borrower has not provided either income or asset information, the lender cannot determine their capacity to repay the loan and that the borrower must be sure that they have the capacity to repay. We will provide our customers sufficient time (60-90 days) to implement this change.

- The disclosure requirement will substantially mitigate Freddie Mac's reputation risks associated with these mortgages. The disclosure requirement, which we have already implemented with some of our customers who sell NINA mortgages to us, provides assurances to Freddie Mac (and the originating lender) that the borrower understood the mortgage they entered into and the additional costs.

- Implement, for NINA mortgages purchased, a maximum LTV of 90% and require full appraisals. These requirements will limit layering of additional risks of mortgages purchased. In addition, we need to create a detailed loan offer product code for this product, so that we can more easily identify these mortgages after purchase. We will provide our customers sufficient time (60-90 days) to implement this change.

- Freddie Mac will lead a task force comprised of key industry representatives, including the MBA, to discuss, recommend, and document best practices associated with the origination, secondary marketing, and servicing of NINA mortgages. This task force, chaired by Bob Tsien of the Mission Division, will evaluate the lending and servicing practices associated with NINA mortgages in order to identify the best practices and additional underwriting guidelines (for example; borrower coaching and leaving the spouse off the note) that can be deployed broadly to mitigate any additional risk. This task force should also seek to understand the borrower and lender/originator demographic associated with this product. An additional focus of this effort is for Freddie Mac to gain industry alignment to condition the market to switch to SISAs, thereby reducing the market demand for NINA. Task force membership may include originators, servicers, mortgage insurers, industry trade groups and consumer advocacy groups.

**RECOMMENDATION** (continued)

- Pursuit of an external strategy to promote our NINA requirements and industry task force. Freddie Mac's leadership of this task force will strengthen our position in the marketplace. Our public positioning regarding this task force will reaffirm Freddie Mac's commitment to improving lending practices, feature our expanded SISA flow offering, and reinforce our position that the mortgage industry has a responsibility to ensure that borrowers understand the long-term financial impact of decisions made during mortgage origination.

If any of the components listed above cannot be carried out, then my recommendation is to leave the NINA market (option two). Appropriate changes to business practices and promotion of Freddie Mac's leadership outlined above provide adequate mitigation to known risks associated with the purchase of NINA mortgages.

**REVIEW PROCESS**
This memorandum was reviewed by the executives listed below. I've grouped them based on their response to my recommendation:

**Supportive**
Bob Ryan, VP Integrated Bid
Dave Stevens, SVP Mortgage Sourcing

**Neutral**
Dave Andrukonis, SVP Enterprise Risk Oversight
Clarke Camper, SVP Government Relations
Susan Gates, VP Public Policy

**Concerned**
Don Bisenius, SVP Mortgage Credit Policy
██████████████████

Bob Tsien, SVP Mission

## APPENDIX

OPPOSING VIEWS/ADDITIONAL CONSIDERATIONS

| Person/Department | Comment/Issue |
|---|---|
| Don Bisenius:<br>Mortgage Credit<br>Policy (ICM) | I disagree with your characterization that NINA mortgages fulfill a marketplace need.  The only group of the 5 groups you list as being examples of the niche for this product that couldn't be otherwise served with stated income products are the "borrowers who for cultural reasons do not trust financial instititutions" and I find it ironic that borrowers who don't trust financial institutions are coming to financial institututions for money.  They trust them enough to take their money, just not provide any information. |
| | Throughout this document we note issues associated with the credit risk.  While these loans have higher credit risks, I don't believe this is the issue being discussed and I am concerned that it detracts from the reputation risk associated with the origination practices.  I am reasonably comfortable that we can cost these risks and can credit enhance those aspects of the credit risk I am concerned about.  I would encourage you to drop the credit risk references and stay focused on the predatory risk. |
| | |

CONFIDENTIAL & PROPRIETARY

| Person/Department | Comment/Issue |
|---|---|
| Bob Tsien:<br>Mission | The disclosure proposal seems more like a legal fig leaf than a real effort to inform borrowers. A more meaningful screen might be to require either a FICO score of 680, or better. Lacking that, we should require counseling as a prerequisite to a NINA. |
| | When we discussed the potential predatory characterization of very high LTV affordable loans, we agreed to live with the risk (at least provisionally). I supported that decision for three factors that I do not believe are present with NINAs:<br>■ First, the external world will view expanded affordable mortgages as clearly an attempt to better serve underserved populations. As a tool to reach underserved borrowers, however, no one in Mission HCL believes NINAs are an important and unique tool because SISAs could do the same for underserved borrowers, with less predatory risk.<br>■ Second, with affordable loans, we are making a measured bet on extending credit to underserved borrowers, whereas NINA s are more of a blind bet. As a defense against predatory charges, some affirmative effort to measure risk and weed households who are probably bad risks is sensible. The sample data, although limited, clearly suggests NINAs are capturing many borrowers who probably are not qualified and a mix of borrower and broker complicity. As an alternative, SISAs are better because we are only exposed to borrower misrepresentation and it is more difficult for a borrower to press a predatory claim.<br>■ Third, I think there is better Seller-Freddie alignment with affordable mortgages because of some degree of repurchase risk, where very little or none exists with NINAs.<br>■ *I could live with a graduated approach to change market behaviors. We need to push forward with more than just pursuit of borrower disclosure.* |
| Ray Romano:<br>Credit Risk Oversight<br>(Dave Andrukonis) | The overall recommendation outlines three requirements, one of which relates to LTV standards. From my perspective, if the proposal were adopted, I think we would want to have a broader discussion on minimum credit standards for NINA loans (i.e.; minimum credit scores, LTV, product types, occupancy, etc). |
| | The core question of the NINA program continues to relate to just one fundamental issue: *what legitimate business need is the NINA program serving that cannot be filled through other more traditional methods including those that are available under SISA programs?* The list of borrower types for which NINA's help expand homeownership opportunities does not address this question and in fact may confuse the issue by introducing borrower motivations that may relate to SISA programs. Moreover, this list is inconsistent with market practices that we have observed. I would strongly recommend that you revise this section to address the core question with facts that we know. If we cannot answer to the central question then we should state upfront that we are unaware of the true motivations of consumers in selecting mortgage options that do not require, at minimum, that they state their income and asset positions. |
| | The overall recommendation makes the assumption that we could not separate out NINA from other Alt A loan programs. While this may ultimately be true, it is not a proven assumption. As market leaders we would at least want to test the theory as we have done in the past with:<br>■ CMBS cash flows only coming in from multi-family properties<br>■ Mandatory arbitration<br>■ Pre-payment penalties<br>■ Financed ancillary insurance products |

FMAC0013699

| | Other things to consider as part of recommendation: |
|---|---|
| | ▪ Limits on Volume |
| | ▪ Program Identification |
| | ▪ Pricing |
| | ▪ Fraud prevention |
| | ▪ QC approach |
| | ▪ Timing for implementation of consumer disclosure |
| | ▪ Articulation of minimum expectations of Industry task force |
| | ▪ Rep and warrant language |

## APPENDIX

### ADDITIONAL INFORMATION

#### Benefits to Freddie Mac
Freddie Mac purchases NINA mortgages primarily through bulk transactions, combined with other Alt-A mortgage types (e.g. Stated Income/Stated Asset). Customers prefer combining several Alt-A types into the same transaction and are unwilling to change this practice. A decision to leave the NINA market places the Alt-A business at great risk. Therefore, the NINA market must be viewed in the context of the impact on Freddie Mac's ability to compete for its share of the Alt-A business.

The following highlights key facts regarding the Alt-A business:
- Alt-A market for the first half of 2004 exceeds $90 billion; accounting for just over 6.5% of total industry originations
  - This volume represents a 136.8% increase from the same period in 2003
  - The second quarter of 2004 exceeded $54 billion
- With one of the lowest GSE flow penetrations of the SF market, the Alt-A segment provides unique market growth opportunities for Freddie Mac
- Freddie Mac's Alt-A purchases, via the bulk transaction path, were $3.5 BB between January and July of 2004. It is estimated that NINA mortgages represent 30% of that total ($1 BB). The retained portfolio has purchased nearly $1BB in NINA mortgages this year.
- The transaction price we receive, as well as the credit enhancements required, adequately cover the credit risk of the mortgages we purchase.

#### Earnings
Bulk Alt-A mortgages purchased between January and July of 2004 ($3.5 BB) contributed $10.3 MM ex-ante PVA. During the same time period, Alt-A represent 38% of mortgages purchased via bulk path, however contribute 68% bulk PVA.

PVA impact of the Alt-A bulk and retained portfolio transactions for the entire year are estimated to be between $25 MM and $75 MM – best estimate is $50 MM and is trending upward. The impact to security spreads [for all securities issued] could cost roughly $4 million per $100 billion of total production, contributing between $10-$15 million of PVA loss. The overall PVA impact number does not include potential impacts on our ability to secure flow contracts from key customers – with the largest example being Countrywide.

#### Mission/HUD Goals
The Alt-A bulk business makes a minor contribution to our HUD goals. This year, the Alt-A bulk transactions contribute 2 basis points toward achieving our Low/Mod goals, 5 basis points to our Special/Affordable goals, and 40 basis points to our Underserved GSE goals. During 2003, the Alt-A bulk business contributed 10 basis points to our Low/Mod and Special/Affordable goals. The sample analyzed by Housing Economics showed that 38% of NINA type loans qualified for the Underserved goal compared to 27% of single-family purchases.

However, NINA loans may have a negative impact on the low/moderate and special affordable goals because, without income information, they cannot count in the numerator when calculating the percentage of goal-qualifying loans purchased by Freddie Mac. In addition, with respect to the underserved goal-qualifying NINA loans, HUD could refuse to count the loans if they are determined to be mortgages with unacceptable terms and conditions as described in HUD's current affordable housing goals Rule. In addition, it is conceivable that regulators or NINA borrowers may allege that either Freddie Mac and/or its sellers/servicers have engaged in practices that would violate anti-predatory lending laws, fair lending laws or unfair and deceptive acts and practices laws.

## Performance Analysis

Housing Analysis, Research and Policy conducted an analysis of NINA mortgages purchased by Freddie Mac, via the bulk transaction path, that were originated during the second and third quarter of 2003. These mortgages were compared to similar full documentation mortgages originated during the same time period. The sample included a total of 7,297 NINA and No Doc mortgages. A decision was made to include both documentation types in this analysis since they are similar – in both cases the borrower is not required to disclose income or assets to the mortgage lender. Please note: the sample size is relatively small and covers a limited period of time.

Highlights from Housing Analysis, Research and Policy included the following:

- NINA (and No Doc) mortgages perform somewhere between 2 and 7 times worse (*more likely to go into delinquency*) than their non-NINA counterparts.
- *Time frame*: About 1% of these were originated before 2003, 94.5% in 2003, and 4.5% in 2004.
- Among the NINAs analyzed, about 10% were ever 30 days delinquent, 2.7% were ever 60 days delinquent, 1% were ever 90 days delinquent, 0.52% were ever in foreclosure, .03% went to REO, .03% had a foreclosure alternative executed (the latter two correspond to a total of 2 loans each).
- The delinquency reason for "excessive obligation" was noted for 92% of the mortgages reflected in the ever-foreclosed category. Excessive obligation is typically found in less than 20% of foreclosures reported to Freddie Mac.
- Eliminating GreenPoint reduces the performance variance -- Greenpoint's delinquencies were nearly twice as high as the remaining sample. In addition, almost all mortgages in the ever-foreclosed category (36/38) were from GreenPoint; the delinquency reason of "excessive obligation" was reported for 92% of the mortgages in this category

## Borrower Race Information

Financial Research completed analysis of borrower race among non-NINA loans and compared that with the race distribution for NINAs. Their analysis[1] used a 10% sample of 2003 fundings and compared that to the sample of NINA mortgages used in the early default analysis mentioned previously.

The proportion of Hispanic borrowers among the NINA loans is over 3 times as high as the proportion among non-NINA loans. Also, the proportion of African-American borrowers among the NINA loans is over twice as high as it is among non-NINA loans.

- *NINA* loans: 40% were missing race information altogether. Of the loans that were not missing race, 66% were white, 18% were Hispanic, and 7% were African-American.
- *Non-NINA* loans: 16% were missing race information. Of the loans that were not missing race, 86% were white, only 5% were Hispanic, and 3% were African-American.

| NINA Loans | | | Random Sample of 2003 Fundings | | |
|---|---|---|---|---|---|
| Borrower Race | Num. Loans | Percent | Borrower Race | Num. Loans | Percent |
| White non-Hispanic | 2,921 | 65.5% | White non-Hispanic | 342,040 | 85.5% |
| Hispanic | 816 | 18.3% | Hispanic | 19,219 | 4.8% |
| African-American | 321 | 7.2% | African-American | 10,968 | 2.7% |
| Asian or Pacific Islander | 244 | 5.5% | Asian or Pacific Islander | 17,070 | 4.3% |
| Other | 139 | 3.1% | Other | 9,630 | 2.4% |
| Native American | 18 | 0.4% | Native American | 1,322 | 0.3% |

**Mortgage File Review**
Operational Risk Management reviewed 100 mortgage files on NINA mortgages purchased from Chase and Countrywide. They selected a random sample of 50 NINA mortgages from each organization.

Several observations from their review and analysis are consistent with information received from the Mortgage Insurers interviewed. Noted in their findings are several concerns that indicate that NINA mortgages may be more susceptible to questionable lending practices:
- Dropping borrowers to qualify is prevalent – co-borrowers were dropped on 62% of loans with married borrowers.
- 22% of borrowers were Hispanic.
- 23% of borrowers increased their mortgage payment by more than 50% from the previous mortgage payment.
- NINA borrower profile has changed from largely self-employed to salaried or fixed income.
- 33 of the 100 loans appeared to have stretched appraisal values.

**GreenPoint MI Rescissions**
We received information showing that mortgage insurer rescinded coverage on 46 NINA mortgages originated by GreenPoint so far this year. Nearly half of these mortgages had the MI coverage rescinded because it was found that the borrower's income was disclosed to the originator/broker. In addition, there are several mortgages where the borrower was unemployed at origination and there was evidence of occupancy mis-representation. It is important to note that this is an adverse sample – all of the mortgages included have gone into foreclosure.

**Mortgage Insurer Interviews**
Part of the product analysis included interviews with five Mortgage Insurers (MIs). Each MI interviewed was asked a standard set of questions and their answers were documented. The information gained from the MIs correlated to the information we found in our mortgage file review and other anecdotal information.